**COURT OF APPEALS
DECISION
DATED AND FILED**

**March 30, 2021**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.    2020AP1436**

**STATE OF WISCONSIN**

Cir. Ct. No.  2015FA192

**IN COURT OF APPEALS
DISTRICT III**

IN RE THE MARRIAGE OF:

ARLENE C. CORPUZ P/K/A ARLENE C. GREGERSON,

   PETITIONER-RESPONDENT,

ST. CROIX COUNTY CHILD SUPPORT AGENCY,

   RESPONDENT,

  V.

CHRISTOPHER S. GREGERSON,

   RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for St. Croix County: R. MICHAEL WATERMAN, Judge. *Affirmed in part; reversed in part and cause remanded with directions*.

Before Stark, P.J., Hruz and Seidl, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Christopher Gregerson, pro se, appeals from a postdivorce order modifying physical placement and child support. We reject Gregerson's arguments regarding physical placement and affirm that portion of the circuit court's order awarding Gregerson and his former spouse, Arlene Corpuz, equal physical placement of their two children. We also reject the majority of Gregerson's arguments regarding child support.

¶2 We agree with Gregerson, however, that the circuit court erred by concluding his "income imputed based on earning capacity" was $2,773 per month, rather than $723 per month. As a result of that error, the court erroneously determined that the amount of Gregerson's monthly income available for child support was $4,823, instead of $2,773. Due to these errors, we reverse that portion of that court's order awarding no child support to either Gregerson or Corpuz. We remand for the court to reconsider the issue of child support in light of the correct amount of Gregerson's income imputed based on earning capacity, the parties' monthly income available for child support, and the best interests of the children.

## BACKGROUND

¶3 Gregerson and Corpuz were married in 2005. They have two minor daughters, who were twelve and eight years old, respectively, at the time of the postdivorce hearing at issue in this appeal. During the parties' marriage, they lived rent-free in a New Richmond, Wisconsin, home owned by Gregerson's mother. At the time of the postdivorce hearing, Gregerson continued to live in that home rent-free.

¶4      Gregerson contends that he "suffers from chronic fatigue, exhaustion, insomnia, and GI problems that started at age 17 following long-term use of antibiotics." He asserts that his symptoms prevent him from working more than part-time. The financial information Gregerson submitted to the circuit court shows that his average income between 1988 and 2015 was $4,904.85 per year, or $408.73 per month.

¶5      Gregerson asserts that after the parties' older daughter was born in 2008, he became a stay-at-home father, while Corpuz entered a nursing program at a local vocational school. Corpuz graduated in December 2010 and began working as a nurse in April 2011. After one year, she and Gregerson decided that she would go back to school to obtain a bachelor's degree in nursing. After completing her bachelor's degree, Corpuz entered the United States Army Nurse Corps in 2014. Corpuz then relocated to Fort Irwin, California, for her employment, while Gregerson and the children remained in Wisconsin.

¶6      Corpuz filed for divorce in May 2015. On March 23, 2016, the circuit court entered a divorce judgment, which incorporated the terms of a marital settlement agreement (MSA) signed by the parties. As relevant to this appeal, the MSA provided that the parties would have joint legal custody of the children and shared physical placement. Specifically, Gregerson would have physical placement 70% of the time (primarily during the school year) and Corpuz would have physical placement 30% of the time (primarily during the summer and school breaks).

¶7      The MSA further stated that Corpuz would pay Gregerson $1,000 per month in child support. That amount was calculated using the child support guidelines, based on monthly income of $4,900 for Corpuz and monthly imputed

income of $2,333 for Gregerson,[1] and based on the children having 112 overnights per year with Corpuz. The MSA also stated that beginning on May 1, 2017, there would be "an annual adjustment in the amount of child support paid, based on a change in either part[y's] earnings."

¶8    Finally, the MSA provided:

> Both parties agree that certain paragraphs of this agreement shall survive the subsequent judgment of divorce and shall have independent legal significance. These agreements are a legally binding contract entered into for good and valuable consideration. In the future, either party may enforce the specific agreements in this or any other court of competent jurisdiction.

¶9    In April 2017, Gregerson applied for an adjustment in child support based on an increase in Corpuz's income. A court commissioner granted that motion in May 2017, increasing Corpuz's child support obligation to $1,503 per month. The court commissioner determined that amount represented guideline support given Corpuz's increased income of $6,815 per month and Gregerson's imputed income under the MSA of $2,333 per month.

¶10    In early 2019, Corpuz moved back to New Richmond. She rented a room from Gregerson in the house owned by his mother where he and the children lived rent-free. On March 11, 2019, the parties stipulated to modify child support. The stipulation provided that Corpuz's income had decreased to $2,060 per month, while Gregerson's imputed income remained at $2,333 per month. Despite the fact that Corpuz and Gregerson were living in the same home, the stipulation

---

[1] Gregerson underwent a vocational evaluation in 2016, before the parties signed the MSA. We discuss the results of the vocational evaluation in greater detail below.

calculated child support based on Corpuz having 112 overnights per year. Pursuant to the stipulation, Corpuz's child support obligation was modified to $267 per month.

¶11 On January 3, 2020, Corpuz moved to modify physical placement, seeking equal physical placement of the parties' daughters. On February 19, 2020, Corpuz moved to modify child support, asserting Gregerson should be required to pay her $250 per month. Around the same time, Corpuz vacated Gregerson's home and moved into a house about two miles away.

¶12 The circuit court held a hearing on Corpuz's motions to modify child support and physical placement on June 11, 2020. Thereafter, the court entered a written order awarding Corpuz equal physical placement of the parties' children. The court acknowledged that under WIS. STAT. § 767.451(1)(b)2. (2019-20),[2] there was a presumption that continuing greater physical placement with Gregerson was in the children's best interests. The court concluded, however, that the statutory presumption had been rebutted. The court further concluded that equal placement would be in the children's best interests based on the factors set forth in WIS. STAT. § 767.41(5)(am).

¶13 The circuit court also determined that the new physical placement schedule warranted a modification of child support. The court found that Gregerson received $500 per month from his mother's trust, as well as rent-free housing, which the court determined was worth $1,550 per month. The court stated those amounts were "sources of income" that should be considered when

---

[2] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

determining Gregerson's monthly income available for child support. The court also found that although Gregerson was not employed, he "[had] the ability to work" and did not "suffer from a disability that precludes employment." The court then stated:

> Mr. Gregerson has experience as a paralegal, and his pro se court filings show it. His research and writing skills are on par with many attorneys who practice before this Court. He could probably work in a local law office or provide litigation support on an independent contractor basis. Based on this Court's experience and knowledge about the wages in the local market, Mr. Gregerson probably can earn at least $16 per hour on a full[-]time basis. The imputed income equals $2,773 per month.

¶14    The circuit court then added together Gregerson's "imputed income, the monthly allowance, and the value of rent-free housing ($2,773 + $500 + $1,550) and arrived at $4,823" as the amount of his monthly income available for child support. The court determined that Corpuz's monthly income available for child support was $4,755. Using those amounts, the court determined that "[u]nder the shared placement formula, with each parent having equal overnights, Mr. Gregerson would owe $9 monthly support." However, because that amount was "negligible and unlikely to provide any meaningful benefit to the children," the court stated it would "deviate from [the] guidelines and set child support at $0 effective July 1, 2020." Gregerson now appeals, challenging the court's determinations regarding both physical placement and child support.

## DISCUSSION

### I. Physical placement

¶15    Gregerson first argues that the circuit court erred by granting Corpuz's motion for equal physical placement of the parties' children.[3]  Whether to modify a physical placement order is directed to the circuit court's discretion. ***Keller v. Keller***, 2002 WI App 161, ¶6, 256 Wis. 2d 401, 647 N.W.2d 426.  We affirm a circuit court's discretionary decision when the court applied the correct legal standard to the facts of record and reached a reasonable result.  ***Id.***

¶16    Our review of a circuit court's discretionary decision may involve underlying questions of law and fact.  *See **Covelli v. Covelli***, 2006 WI App 121, ¶13, 293 Wis. 2d 707, 718 N.W.2d 260.  We review any questions of law independently, but we will not disturb the circuit court's factual findings unless they are clearly erroneous.  *See **id.***  Whether a court applied the proper legal standard is a question of law for our independent review.  *See **Keller***, 256 Wis. 2d 401, ¶6.

¶17    When more than two years have elapsed since the entry of a physical placement order, a circuit court may modify that order in a way that would substantially alter the time a parent may spend with his or her child only if the court finds both: (1) that the modification is in the child's best interests; and (2) that there has been a substantial change in circumstances since the entry of the last physical placement order.  WIS. STAT. § 767.451(1)(b)1.  There is a rebuttable

---

[3] Corpuz has not filed a brief in this appeal.  The St. Croix County Child Support Agency ("the County") filed a brief addressing only Gregerson's arguments regarding child support.

presumption that "[c]ontinuing the child's physical placement with the parent with whom the child resides for the greater period of time is in the best interest of the child." Sec. 767.451(1)(b)2.b.

¶18 In this case, Gregerson does not dispute that a substantial change in circumstances occurred with respect to physical placement. He argues, however, that the circuit court erred by concluding Corpuz rebutted the presumption that it was in the children's best interests to continue the placement schedule set forth in the divorce judgment, which awarded 70% physical placement to Gregerson.

¶19 Specifically, Gregerson argues the circuit court failed to cite any evidence in support of its conclusion that the statutory presumption had been rebutted. A review of the court's decision, however, shows that Gregerson is incorrect. The court noted that the divorce judgment had awarded Corpuz 30% physical placement not because of any need to limit her placement time, but due to her out-of-state military employment and the children's school schedule in New Richmond. The court explained that the prior placement schedule had become "obsolete" because Corpuz had moved back to New Richmond and lived only two miles away from Gregerson. The court concluded it would be "contrary to the children's best interests to deprive them of time with their mother in adherence to an obsolete parenting schedule."

¶20 Moreover, the circuit court considered the relevant factors from WIS. STAT. § 767.41(5)(am) when addressing whether equal physical placement would be in the children's best interests. First, the court considered the wishes of both the parties and the children. *See* § 767.41(5)(am)1. and 2. The court noted that Gregerson and Corpuz wanted their daughters to share the same placement schedule and wanted to honor their daughters' wishes. The court observed,

8

however, that the girls' preferences were "mutually exclusive," as the younger daughter wanted to have equal time with both parents, but the older daughter did not. The court reconciled that conflict by noting, in agreement with the recommendation of the children's guardian ad litem (GAL), that the older daughter's "preference for more time with her father can be met by simply allowing her to visit her father when she wants." The court stated the older daughter was "a mature and intelligent 12-year-old" whose desire to spend time with Gregerson could "easily be accommodated outside the regular placement schedule when appropriate."

¶21     The circuit court next considered the children's relationships with their parents and each other, noting that the older daughter had a stronger relationship with Gregerson, the younger daughter had a stronger relationship with Corpuz, and the girls had a strong relationship with one another. *See* WIS. STAT. § 767.41(5)(am)3. The court then noted that both parents spent quality time with the children and were "fully engaged and invested in the children's activities and pursuits." *See* § 767.41(5)(am)4. The court also observed that the children were well adjusted to both parents' homes, to their school, and to the community. *See* § 767.41(5)(am)5.

¶22     The circuit court then considered the children's ages and developmental needs, noting that they were twelve and eight years old; they were old enough to understand that their parents were divorced and living separately; they were old enough to express their wishes; and both parents fulfilled the children's needs. *See* WIS. STAT. § 767.41(5)(am)6. The court also noted that the children were healthy, and that while Corpuz and Gregerson had various mental and physical health conditions, those conditions did not interfere with their ability to parent the children. *See* § 767.41(5)(am)7.

¶23  The circuit court next reasoned that equal placement would "fulfill the need for regularly occurring and meaningful periods of physical placement" with both parents. *See* Wis. Stat. § 767.41(5)(am)8. The court also noted that the availability of childcare was not an issue, as Corpuz and Gregerson had the same access to childcare resources and had never before had any problems with childcare. *See* § 767.41(5)(am)9.

¶24  Turning to the parties' cooperation and communication, *see* Wis. Stat. § 767.51(5)(am)10., the circuit court acknowledged that the parties "have disagreements about parenting issues." The court stated, however, that the parties are "usually able to set aside their disagreements and co-parent as mature adults," that they "have a solid history of including each other in vacations and family events," and that they "have the communication and cooperation skills to successfully adhere to a 2-2-5 placement schedule." The court also noted that both parents had encouraged and fostered the children's relationships with the other parent. *See* § 767.51(5)(am)11.

¶25  Finally, the circuit court observed that Corpuz had previously "lost her temper and … shouted at Mr. Gregerson and [the parties' older daughter]." Nevertheless, the court stated the shouting "appear[ed] to be episodic, not chronic." The court stated there was no evidence "that anyone was abused or endangered" during those episodes. *See* Wis. Stat. § 767.41(5)(am)12., 13. Based on all of these factors, the court could reasonably conclude Corpuz had rebutted the statutory presumption that it would be in the children's best interests to continue the unequal physical placement schedule set forth in the divorce judgment.

¶26 Gregerson nevertheless argues that the circuit court erred because "[t]he greater weight of evidence was against equalizing placement." In support of that assertion, Gregerson cites the following: (1) his own testimony that on one occasion, Corpuz told the parties' younger daughter to run out into a blind intersection without first checking for cars, and Corpuz later refused to apologize for doing so; (2) Corpuz's testimony that during a home visit by the GAL, the parties' older daughter banged her own head against a glass window three times because she was frustrated and angry that Corpuz was not listening to her; (3) a therapist's testimony that she had diagnosed the parties' older daughter with an anxiety disorder; (4) Gregerson's testimony that he has a practice of listening patiently to the children and has taught them to do the same to others; (5) the older daughter's statement to her therapist that Gregerson "has taught her healthy core beliefs which include helping, listening, understanding, and caring for others"; and (6) the court's findings that the older daughter "prefers to spend more time with Mr. Gregerson because she has a stronger relationship with him than her mother," and that there is "some concern about [the older daughter's] reserved demeanor and bumpy relationship with Ms. Corpuz."

¶27 Gregerson's argument that the evidence cited above prevented the circuit court from granting equal placement is unpersuasive. The court was not required to accept Gregerson's testimony or his opinions regarding the weight of the evidence. *See State v. Peppertree Resort Villas, Inc.*, 2002 WI App 207, ¶19, 257 Wis. 2d 421, 651 N.W.2d 345. In particular, the court could consider Corpuz's assertion that Gregerson had "brainwashed" the children against her, as well as testimony by the older daughter's therapist that it was "quite possible" Gregerson had alienated the older daughter from Corpuz. The GAL expressed a similar concern and also opined that Gregerson "acts like too much of a friend

instead of a parent to these children." Based on these facts, the court could reasonably view with skepticism Gregerson's claim that equal physical placement would be harmful to the parties' older daughter.

¶28 In addition, the circuit court's acknowledgement that the parties' older daughter has a strong relationship with Gregerson and a "bumpy" relationship with Corpuz does not undermine its ultimate conclusion that equal physical placement would be in the children's best interests. As noted above, the court was motivated by the strong bond the girls have with one another, the younger daughter's desire for equal placement, and the fact that it was possible to honor the older daughter's desire for additional time with Gregerson by allowing her to visit him outside the formal placement schedule. The court could also properly consider the GAL's statement that he "unequivocally believe[d]" equal placement would be in the children's best interests.

¶29 Gregerson also argues that the circuit court erred because it "did not consider the wishes of the [parties' older daughter] in allocating placement." Although Gregerson acknowledges that a court "may allocate placement differently than the child wishes when other placement factors outweigh the child's wishes," he asserts the court "cannot refuse to consider the wishes of a child who is mature and intelligent enough to have and express a reasoned preference."

¶30 Gregerson's argument in this regard is specious. The circuit court specifically noted that the parties' older daughter wanted greater placement with Gregerson than Corpuz. The court determined, however, that other factors outweighed her wishes—specifically, the benefit of keeping both girls on the same placement schedule and the younger daughter's desire for equal placement. And,

once again, the court reasonably determined that the older daughter's wishes could be accommodated by allowing her to see Gregerson outside the formal placement schedule. Gregerson's claim that the court did not consider the older daughter's wishes therefore lacks any merit.

¶31 In all, the circuit court considered the relevant facts, applied the proper legal standard, and reasonably concluded Corpuz had rebutted the statutory presumption that it would be in the children's best interests to continue the unequal physical placement schedule set forth in the divorce judgment. On this record, we cannot conclude that the court erroneously exercised its discretion by granting Corpuz equal physical placement of the parties' children.

## II. Child support

¶32 Gregerson also argues that the circuit court erred in several ways when it modified child support by ordering that neither party would pay child support to the other. A circuit court has discretion to modify a parent's child support obligation after finding that a substantial change in circumstances has occurred. *Winkler v. Winkler*, 2005 WI App 100, ¶23, 282 Wis. 2d 746, 699 N.W.2d 652; *see also* WIS. STAT. § 767.59(1f)(a). Again, we will affirm the court's discretionary decision as long as it applied the correct legal standard to the facts of record and reached a reasonable result. *Keller*, 256 Wis. 2d 401, ¶6.

¶33 Gregerson first argues that the circuit court erred by concluding his monthly income available for child support was $4,823; specifically, he contends the court was bound by the terms of the MSA, which imputed income to him of only $2,333 per month. Second, Gregerson argues the court incorrectly determined that his earning capacity was $2,773 per month, based on its clearly erroneous findings that he had the ability to work full-time and had experience

working as a paralegal. Third, Gregerson argues that even if the court properly determined his monthly earning capacity, it improperly determined both his gross income and his income imputed based on earning capacity, and it therefore erroneously determined that his monthly income available for child support was $4,823. We address these arguments in turn.

### A. Terms of the MSA

¶34     Gregerson argues the circuit court erred by "ignor[ing] the child support terms in the MSA and re-tr[ying] the divorce case." He contends the MSA expressly provided "that [Corpuz] was to pay [him] guideline child support, based on her actual income, an income of $2,333 imputed to [him], and the children's placement schedule." Gregerson argues the child support terms in the MSA are "binding" and are subject to modification only "if there is a significant change in the facts the stipulation was based upon and the best interests of the children require changing the terms."[4]

¶35     In *May v. May*, 2012 WI 35, ¶23, 339 Wis. 2d 626, 813 N.W.2d 179, our supreme court recognized "that Wisconsin courts have long utilized their equitable authority to uphold stipulations governing child support, and that such stipulations should be upheld unless doing so would threaten the best interests of

---

[4] Based on our review of the record, it does not appear that Gregerson raised this issue in the circuit court. As such, we could conclude he forfeited his argument that the court was bound by the child support provisions of the MSA. *See Tatera v. FMC Corp.*, 2010 WI 90, ¶19 n.16, 328 Wis. 2d 320, 786 N.W.2d 810. Notably, however, Corpuz did not file a brief in this appeal, and the County's brief does not respond to Gregerson's argument regarding the binding nature of the MSA. Based on those failures, we could deem Gregerson's argument conceded. *See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979). Instead, we exercise our discretion to ignore both Gregerson's apparent forfeiture and the respondents' concession of the issue, and we address the merits of Gregerson's argument.

the children." After analyzing a number of prior cases, the *May* court established a "framework governing child support stipulations and orders." *Id.*, ¶34.

¶36 First, the court stated that "ceilings on child support payments are presumed to be invalid" because "the best interests of the child require that a payee spouse cannot be deprived of the ability to seek a modification in child support." *Id.* Second, the court stated that "an unmodifiable floor on child support payments that is not limited in duration … or that has an excessively long duration … may violate public policy." *Id.*, ¶35 (citations omitted). Third, the court stated that when the parties have entered into a stipulation regarding child support "for a limited period of time that the court has adopted, courts will attempt to give effect to the parties' intentions where the stipulation was entered into freely and knowingly, was fair and equitable when entered into, and is not illegal or violative of public policy." *Id.*, ¶36. Fourth, courts "retain the equitable power to consider circumstances in existence when the stipulation is challenged that were unforeseen by the parties when they entered into the stipulation if those circumstances adversely affect the best interests of the child." *Id.*, ¶37. Under that scenario, "courts retain the equitable authority and discretion to refuse to uphold all child support stipulations, even those that under principles of estoppel would otherwise be enforceable." *Id.*

¶37 We conclude that under the circumstances of this case, the circuit court could reasonably decide to exercise its equitable authority not to adhere to the child support terms of the MSA, pursuant to the fourth prong of the *May* framework. At the time the parties signed the MSA in March 2016, Corpuz was employed by the military in California and had physical placement of the children only 30% of the time, while Gregerson resided in Wisconsin and had physical placement 70% of the time. There is nothing in the record to indicate that, at the

time the parties signed the MSA, they foresaw that in 2020 Corpuz would have moved back to Wisconsin and would be granted equal physical placement of the children.

¶38    Moreover, at the time the MSA was signed, Gregerson's financial disclosure form indicated that his only sources of income were public assistance payments and child support from Corpuz. By 2020, however, Gregerson reported that he was receiving $500 per month from his mother's trust. Again, there is no evidence in the record that the parties foresaw Gregerson's receipt of that additional income at the time they signed the MSA.

¶39    Given these meaningful and unforeseen changes in the parties' circumstances, the circuit court could reasonably conclude that adhering to the child support terms of the MSA would adversely affect the best interests of the children. When Corpuz moved back to Wisconsin and was granted equal physical placement of the children, she had the obligation to provide equally for them and to have a home that allowed her to do so. Her need to obtain housing suitable for the children to live with her 50% of the time affected the amount of money she had available to provide for the children in other necessary ways. At the same time, Gregerson continued to receive rent-free housing from his mother, and he had also begun to receive $500 monthly payments from her trust. Under these circumstances, the court could reasonably exercise its equitable authority to deviate from the terms of the MSA by reevaluating the amount of Gregerson's income available for child support.

¶40    Gregerson argues the circuit court could not impute more income to him than the amount specified in the MSA because there was no new evidence regarding his earning capacity. He also argues that the court could not include the

value of his rent-free housing as part of his income available for child support because he was already receiving that benefit at the time the MSA was signed. In other words, Gregerson argues there has been no change in circumstances regarding either his earning capacity or his housing costs since the parties signed the MSA.

¶41 This argument misses the mark because it focuses exclusively on the circumstances pertaining to Gregerson, rather than considering the totality of the circumstances affecting Gregerson, Corpuz, and their children. As explained above, the circumstances surrounding Gregerson, Corpuz, and the children changed significantly from the time the MSA was signed in 2016 to the time Corpuz moved to modify child support in 2020. As stated in *May*, courts "retain the equitable power to consider circumstances in existence when the stipulation is challenged that were unforeseen by the parties when they entered into the stipulation if those circumstances adversely affect the best interests of the child." *May*, 339 Wis. 2d 626, ¶37. Given the unforeseen changes in circumstances described above, the circuit court could reasonably conclude that calculating child support based solely on Gregerson's imputed income of $2,333 per month, as specified in the MSA, would adversely affect the children's best interests. As such, the court could reasonably exercise its equitable authority to disregard that figure and reassess the amount of Gregerson's income available for child support.

### B. Findings regarding Gregerson's earning capacity

¶42 Gregerson next argues that even if the circuit court was permitted to deviate from the amount of imputed income set forth in the MSA, the court nevertheless erred by determining that his earning capacity was $2,773 per month. Specifically, Gregerson argues the court's factual findings that he had the ability

to work full-time and had experience working as a paralegal were clearly erroneous. A finding of fact is clearly erroneous when it is against the great weight and clear preponderance of the evidence. *Phelps v. Physicians Ins. Co. of Wis.*, 2009 WI 74, ¶39, 319 Wis. 2d 1, 768 N.W.2d 615.

¶43 Gregerson has not shown that the circuit court's factual finding regarding his ability to work full-time was clearly erroneous. The record contains a vocational evaluation of Gregerson dated February 2, 2016. The evaluation states:

> Mr. Gregerson's case is complex from a vocational perspective. He is a bright, academically capable individual who has obvious cognitive skills. However, his employment history has been marginal at best. Psychological and medical reports make statements such as, "He would likely struggle with certain work outside the home as well." And "I believe [Gregerson's] fatigue is severely limiting and he would struggle at this time to work full-time." However, neither his primary care physician nor [psychologist Nicole] Ward actually says that he can't work. [Physician Robin] Reichert does state, "He would likely need to work in something of a sedentary nature."

The vocational evaluation provided a sufficient basis for the court to find that Gregerson had the ability to work full-time in a sedentary occupation. Although Gregerson asserts he has "never … worked full-time in his entire adult life," that did not prevent the court from finding that he was capable of working full-time in some capacity.

¶44 Conversely, we agree with Gregerson that the circuit court's factual finding that he had experience working as a paralegal was clearly erroneous. Gregerson asserts—and our review of the record confirms—that there is no evidence Gregerson has ever worked as a paralegal. The County attempts to justify the court's finding by asserting that Corpuz "testified as to her opinion

regarding [Gregerson's] skills as a paralegal." In support of that assertion, the County cites the following exchange:

> THE COURT: Yeah, I don't think—is anyone disagreeing with the imputed income for Mr. Gregerson at $2,333?
>
> MS. CORPUZ: I believe it should be higher because he has all this paralegal—I don't even know. Okay.
>
> MR. GREGERSON: Your Honor—
>
> THE COURT: Wait. Wait. Let her finish the thought. His paralegal work experience, is that what you're talking about?
>
> MS. CORPUZ: Yes. And he—he is a trustee for his mother—for his mother and he has been managing her trusts and I don't know how much.

Corpuz then made additional assertions about Gregerson's mother's trust. She did not, however, provide any additional testimony about Gregerson having worked as a paralegal. We agree with Gregerson that Corpuz's vague reference to "all this paralegal—I don't even know" did not provide a sufficient basis for the court to find that Gregerson had experience working as a paralegal.

¶45   Nevertheless, we do not agree with Gregerson that the circuit court erred by finding that he had the ability to earn $2,773 per month. There was a sufficient basis for that finding, even absent the court's erroneous belief that Gregerson had experience working as a paralegal. In particular, the court noted the high quality of Gregerson's pro se filings in this case, observing that "[h]is research and writing skills are on par with many attorneys who practice before this Court." The court therefore found that Gregerson "could probably work in a local law office or provide litigation support on an independent contractor basis." Based on the court's "experience and knowledge about the wages in the local

market," the court found that Gregerson could earn at least $16 per hour on a full-time basis, or $2,773 per month.[5]

¶46   The vocational evaluation further supported the circuit court's finding as to Gregerson's earning capacity.  The evaluation stated that the entry hourly wage for paralegals and legal assistants was $18.36—over two dollars per hour more than what the court stated Gregerson was capable of earning.  In addition, the evaluation stated that Gregerson was also capable of working as either a customer service representative or another type of clerk.  The evaluation stated the entry hourly wages for those occupations were $12.54 and $12.41, respectively, and the median hourly wages were $17.61 and $17.09, respectively. The court determined Gregerson had the ability to earn $16 per hour, which was less than the median hourly wages for both of those occupations.  The court could properly consider that if Gregerson had sought employment in one of those occupations after the vocational evaluation was completed in 2016, he would no longer be earning the entry hourly wage.  Thus, although the court erred when it stated Gregerson had experience working as a paralegal, the record supports its ultimate finding that he was capable of earning $16 per hour, or $2,773 per month.

*C.  Calculation of Gregerson's "income available for child support"*

¶47   Gregerson next argues the circuit court erroneously determined that his "income available for child support" was $4,823.  Our resolution of this issue

---

[5] The vocational evaluation stated that Gregerson would "likely" need training to work as a paralegal.  Gregerson asserts he has not had any new training since 2016.  The circuit court could reasonably find, however, that even without formal training, the high quality of Gregerson's work showed he was capable of obtaining employment as a paralegal in the local market.

requires us to interpret various provisions of the Wisconsin Administrative Code. The interpretation of an administrative code provision presents a question of law that we review independently, applying the same principles that we use when interpreting statutes. ***Orion Flight Servs., Inc. v. Basler Flight Serv.***, 2006 WI 51, ¶18, 290 Wis. 2d 421, 714 N.W.2d 130.

¶48 Pursuant to the authority granted by WIS. STAT. § 49.22(9), the Wisconsin Department of Children and Families has promulgated WIS. ADMIN. CODE ch. DCF 150 (June 2019),[6] "for the purpose of establishing a standard to be used in determining child support." WIS. ADMIN. CODE § DCF 150.01(1). As relevant to this appeal, WIS. ADMIN. CODE § DCF 150.03(1) sets forth the procedure a circuit court must use to calculate a parent's "monthly income available for child support." Specifically, it states that a court

> shall determine a parent's monthly income available for child support by adding together the parent's annual gross income or, if applicable, the parent's annual income modified for business expenses; the parent's annual income imputed based on earning capacity; and the parent's annual income imputed from assets, and dividing that total by 12.

Sec. DCF 150.03(1).

¶49 In this case, the circuit court determined that Gregerson's gross income was $2,050 per month, comprised of his $500 monthly payments from his mother's trust and the value of his rent-free housing, which the court determined to be $1,550 per month. The court determined that Gregerson's imputed income based on earning capacity was $2,773 per month. By adding those amounts

---

[6] All references to WIS. ADMIN. CODE ch. DCF 150 are to the June 2019 register.

together, the court determined that Gregerson's income available for child support was $4,823 per month.

¶50    Gregerson argues the circuit court's determination in that regard was erroneous because the court erred in calculating both his gross income and his income imputed based on earning capacity.  First, Gregerson argues the court erred by including the value of his rent-free housing in his gross income.  We disagree.  The term "gross income" is expressly defined to include: a party's "[s]alary and wages," *see* WIS. ADMIN. CODE § DCF 150.02(13)(a)1.; income from a variety of other named sources, *see* § DCF 150.02(13)(a)2.-9.; and "*[a]ll other income, whether taxable or not*," subject to certain exceptions not applicable here, *see* § DCF 150.02(13)(a)10. (emphasis added).  The value of Gregerson's rent-free housing qualified as part of his gross income under § DCF 150.02(13)(a)10.

¶51    Our supreme court's decision in ***Hirth v. Hirth***, 48 Wis. 2d 491, 180 N.W.2d 601 (1970), supports this conclusion.  In ***Hirth***, the court considered whether a husband's "right to use without cost to him (under an arrangement with his own company) an apartment in Marina Towers, Chicago, Illinois; and the Cadillac automobile and food and travel expenses furnished to him by his own company" should be treated as "income" for purposes of determining the husband's ability to pay maintenance.[7]  ***Id.*** at 495.  The court concluded those benefits should be treated as income, stating: "Income as applicable to ability to

---

[7] Although ***Hirth v. Hirth***, 48 Wis. 2d 491, 180 N.W.2d 601 (1970), involved the ability to pay maintenance, rather than child support, this court later relied upon ***Hirth*** in a decision involving family support.  *See* ***Kastelic v. Kastelic***, 119 Wis. 2d 280, 285-86, 350 N.W.2d 714 (Ct. App. 1984).

pay is to be defined as including all income, including cash equivalences and benefits accruing to him from any source. It is not limited to the salary check that is paid to him by his corporation." *Id.* The circuit court's decision to include the value of Gregerson's rent-free housing in his gross income was proper under *Hirth*.[8]

¶52 Gregerson also argues the circuit court erred by determining that his income imputed based on earning capacity was $2,773 per month, rather than $723 per month. The term "[i]ncome imputed based on earning capacity"

> means the amount of income that exceeds the parent's actual income and represents the parent's ability to earn, based on the parent's education, training and recent work experience, earnings during previous periods, current physical and mental health, history of child care responsibilities as the parent with primary physical placement, and the availability of work in or near the parent's community.

WIS. ADMIN. CODE § DCF 150.02(14). WISCONSIN ADMIN. CODE § DCF 150.03(3) specifies the method a circuit court is to use when calculating a parent's

---

[8] Gregerson argues "the imputation of gross income for free housing under guideline child support is without precedent (when the housing is not in-kind compensation from an employer)." He does not explain, however, why the source of a housing benefit should determine whether the value of that benefit is included in the recipient's gross income for purposes of calculating child support. Notably, *Hirth* stated that a party's income "includ[es] cash equivalences and benefits accruing to him *from any source*." *Hirth*, 48 Wis. 2d at 495 (emphasis added).

Gregerson also argues *Zimmerman v. Zimmerman*, 169 Wis. 2d 516, 485 N.W.2d 294 (Ct. App. 1992), stands for the proposition that "[t]he absence of a mortgage obligation is relevant to the assessment of a party's economic circumstances, but does not translate into imputed income under the applicable administrative rule." What *Zimmerman* actually stated, however, is that the absence of a mortgage obligation "does not, *per se*, translate into imputed income under" a prior administrative code provision. *Id.* at 522-23. *Zimmerman* does not prevent a court from treating the value of free housing provided to a party as part of that party's gross income under WIS. ADMIN. CODE § DCF 150.02(13)(a)10.

income imputed based on earning capacity, stating in relevant part: "If a parent has gross income or income modified for business expenses below his or her earning capacity, the income imputed based on earning capacity shall be the difference between the parent's earning capacity and the parent's gross income or income modified for business expenses."[9]

¶53 We agree with Gregerson that the plain language of WIS. ADMIN. CODE § DCF 150.03(3) required the circuit court to calculate his income imputed based on earning capacity by determining the difference between his earning capacity and his gross income—in other words, by subtracting his gross income of $2,050 per month from his earning capacity of $2,773 per month. Using that method, Gregerson's income imputed based on earning capacity is $723 per month. Instead of applying the method set forth in § DCF 150.03(3) to determine Gregerson's income imputed based on earning capacity, the circuit court simply treated his income imputed based on earning capacity as being synonymous with his earning capacity of $2,773 per month. By doing so, the court failed to comply with § DCF 150.03(3), and it therefore applied the incorrect legal standard.

¶54 The County argues WIS. ADMIN. CODE § DCF 150.03(3) is "discretionary, not mandatory," and, as such, the circuit court was not required to follow the procedure set forth in that section for calculating Gregerson's income imputed based on earning capacity. We disagree. Section DCF 150.03(3) begins by stating that a court "may" impute income to a parent under certain circumstances. The word "may" indicates that the decision whether to impute

---

[9] The term "[i]ncome modified for business expenses" is defined in WIS. ADMIN. CODE § DCF 150.02(16). Neither Gregerson nor the County argues that term is relevant to this appeal.

income is discretionary. Section DCF 150.03(3) goes on to state, however, that "[i]f a parent has gross income or income modified for business expenses below his or her earning capacity, the income imputed based on earning capacity *shall be* the difference between the parent's earning capacity and the parent's gross income or income modified for business expenses." (Emphasis added.) The use of the word "shall" in that sentence indicates that once a court has made the discretionary decision to impute income, the court is required to calculate the amount of income imputed based on earning capacity using the method set forth in § DCF 150.03(3).

¶55 The County correctly notes that WIS. ADMIN. CODE § DCF 150.03(1) requires a circuit court to determine a parent's monthly income available for child support by "*adding together* the parent's annual gross income or, if applicable, the parent's annual income modified for business expenses; the parent's annual income imputed based on earning capacity; and the parent's annual income imputed from assets, and dividing that total by 12." (Emphasis added.) Gregerson does not dispute, however, that § DCF 150.03(1) required the circuit court to add together his gross income and his income imputed based on earning capacity to determine his monthly income available for child support. Instead, he argues the court erred when it determined that his income imputed based on earning capacity was $2,773 rather than $723. The fact that § DCF 150.03(1) required the court to add together Gregerson's gross income and income imputed based on earning capacity does not defeat his argument that the court erred when calculating his income imputed based on earning capacity.

¶56 The County also attempts to characterize Gregerson's monthly payments from the trust and the value of his rent-free housing as "income imputed from assets" under WIS. ADMIN. CODE §§ DCF 150.02(15) and 150.03(4). If that were the case, those amounts would not be part of Gregerson's gross income and

25

therefore would not be subtracted from his earning capacity when determining his income imputed based on earning capacity under § DCF 150.03(3).

¶57   The County's argument fails for two reasons.  First, the circuit court expressly treated the payments from the trust and the value of the rent-free housing as part of Gregerson's gross income under WIS. ADMIN. CODE § 150.01(13)(a)10.  Second, those amounts do not fall within the administrative code's definition of the term "income imputed from assets."  Under WIS. ADMIN. CODE § DCF 150.02(15), income imputed from assets

> means the amount of income ascribed to assets that are unproductive and to which income has been diverted to avoid paying child support or from which income is necessary to maintain the child or children at the standard of living they would have if they were living with both parents, and that exceeds the actual income from the assets.

Under this definition, income imputed from assets clearly refers to income that a parent could be, but is not, earning from assets that are instead "unproductive." Here, there is no allegation that either the assets in Gregerson's mother's trust or the home where he lives rent-free are "unproductive," or that Gregerson could be earning income from those assets.  Moreover, WIS. ADMIN. CODE § DCF 150.03(4) clarifies that when determining the amount of a parent's income imputed from assets, a court considers only assets that are owned by the parent. Gregerson does not own either the assets in his mother's trust or the home where he lives.

¶58   For the reasons explained above, we agree with Gregerson that the circuit court applied an incorrect legal standard—and therefore erroneously exercised its discretion—when it determined that his income imputed based on earning capacity was $2,773 per month, rather than $723 per month.  As a result of

26

that error, the court incorrectly determined that Gregerson's income available for child support was $4,823 per month. Instead, Gregerson's income available for child support is $2,773 per month—the sum of his gross income ($2,050) and his income imputed based on earning capacity ($723). *See* WIS. ADMIN. CODE § DCF 150.03(1).

¶59 We acknowledge that this result appears somewhat counterintuitive. The total of Gregerson's actual monthly income plus his monthly earning capacity is $4,823. Failing to treat that entire amount as Gregerson's income available for child support arguably results in Corpuz paying more than her fair share for the children's support under the shared placement formula. Our analysis, however, is dictated by the plain language of the relevant administrative code provisions when, as here, the court in its discretion does not deviate from the child support guidelines. When a provision of the administrative code is unambiguous, we must apply its plain meaning. *State v. Bucheger*, 149 Wis. 2d 502, 507, 440 N.W.2d 366 (Ct. App. 1989). Under WIS. ADMIN. CODE § DCF 150.03(3), the circuit court was unambiguously required to calculate Gregerson's income imputed based on earning capacity by subtracting his gross income from his earning capacity. The court was then required to add that amount to Gregerson's gross income to determine his income available for child support. *See* § DCF 150.03(1). If the court believed the result of those calculations was unfair to either Corpuz or the

children, it could have alleviated any perceived unfairness by deviating from the percentage standard, as permitted by DCF § 150.03(11).[10]

¶60    Because the circuit court erroneously determined Gregerson's income imputed based on earning capacity, and therefore erroneously determined his income available for child support, we reverse that portion of the court's order setting child support at $0.  We remand for the court to reconsider the issue of child support, in light of the correct amount of Gregerson's income imputed based on earning capacity, the parties' monthly income available for child support, and the best interests of the children.[11]

¶61    No party shall receive appellate costs.    *See* WIS. STAT. RULE 809.25(1).

        *By the Court.*—Order affirmed in part; reversed in part and cause remanded with directions.

---

[10] The circuit court's determination of child support cannot be justified on the grounds that the court properly calculated Gregerson's income imputed based on earning capacity and income available for child support but then decided to deviate from the percentage standard.  The court's analysis clearly shows that it improperly calculated Gregerson's income imputed based on earning capacity.  As a result of that error, the court erroneously determined the amount of Gregerson's income available for child support.  The court then applied the percentage standard to determine the parties' child support obligations.  Although the court ultimately deviated slightly from the percentage standard, it did so because the amount of child support Gregerson would have been required to pay was "negligible and unlikely to provide any meaningful benefit to the children."  The court did not deviate from the percentage standard based on any perceived unfairness to Corpuz or the children due to the amount of Gregerson's income available for child support.

[11] Gregerson also argues that by determining his income available for child support was $4,823 per month, the circuit court violated "federal and state public policy and legislative intent," which require "right-sized" child support orders.  Because we reverse the court's child support determination on other grounds, we need not address this additional argument.  *See* ***Turner v. Taylor***, 2003 WI App 256, ¶1 n.1, 268 Wis. 2d 628, 673 N.W.2d 716.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.